**WARD, KEENAN & BARRETT, P.C.**
Gerald Barrett, SBN 5855
3838 N. Central Avenue, Suite 1720
Phoenix, Arizona  85012
Telephone:  (602) 279-1717
Facsimile:  (602) 279-8908
gbarrett@wardkeenanbarrett.com

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, Delaware  19803
Telephone: (302) 295-5306
Facsimile: (302) 654-7530
BDL@rl-legal.com
GMS@rl-legal.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Parshall, individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiffs.<br><br>                v.<br><br>Lifelock, Inc.; Roy A. Guthrie; Hilary A. Schneider; Todd Davis; Gary Briggs; David Cowan; Albert Pimentel; Thomas J. Ridge; Jaynie Miller Studenmund; Symantec Corporation; and L116 Merger Sub, Inc.,<br><br>                Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants,

alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on November 21, 2016 (the "Proposed Transaction"), pursuant to which LifeLock, Inc. ("LifeLock" or the "Company") will be acquired by Symantec Corporation ("Parent") and L1116 Merger Sub, Inc. ("Merger Sub," and together with Parent, "Symantec").

2. On November 20, 2016, LifeLock's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, shareholders of LifeLock will receive $24.00 per share in cash.

3. On December 9, 2016, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to

2

Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of LifeLock common stock.

9. Defendant LifeLock is a Delaware corporation and maintains its principal executive office at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281. LifeLock's common stock is traded on the NYSE under the ticker symbol "LOCK."

10. Defendant Roy A. Guthrie ("Guthrie") is a director and Chairman of the Board of LifeLock. According to the Company's Form DEF 14A filed with the SEC on March 24, 2016 (the "2016 Proxy"), Guthrie is Chair of the Audit Committee, a member of the Compensation Committee, and a member of the Nominating & Corporate Governance Committee.

11. Defendant Hilary A. Schneider ("Schneider") is a director and President of LifeLock and was named Chief Executive Officer ("CEO") in March 2016.

3

12. Defendant Todd Davis ("Davis") is a director of LifeLock and has served as Vice Chairman since March 2016.

13. Defendant Gary Briggs ("Briggs") is a director of LifeLock.  According to the Company's 2016 Proxy, Briggs is a member of the Compensation Committee and the Nominating & Corporate Governance Committee.

14. Defendant David Cowan ("Cowan") is a director of LifeLock.

15. Defendant Albert Pimentel ("Pimentel") is a director of LifeLock. According to the Company's 2016 Proxy, Pimentel is a member of the Audit Committee.

16. Defendant Thomas J. Ridge ("Ridge") is a director of LifeLock.  According to the Company's 2016 Proxy, Ridge is Chair of the Nominating & Corporate Governance Committee.

17. Defendant Jaynie Miller Studenmund ("Studenmund") is a director of LifeLock.  According to the Company's 2016 Proxy, Studenmund is Chair of the Compensation Committee and a member of the Audit Committee.

18. The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

19. Defendant Parent is a Delaware corporation and maintains its principal executive office at 350 Ellis Street, Mountain View, California 94043.

20. Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

**CLASS ACTION ALLEGATIONS**

21. Plaintiff brings this action as a class action on behalf of himself and the

4

other public stockholders of LifeLock (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22. This action is properly maintainable as a class action.

23. The Class is so numerous that joinder of all members is impracticable. As of November 14, 2016, there were approximately 94,262,360 shares of LifeLock common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-

party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

28.     LifeLock is a leading provider of proactive identity theft protection services for consumers and consumer risk management services for enterprises.

29.     The Company's threat detection, proactive identity alerts, and comprehensive remediation services help provide peace of mind for consumers amid the growing threat of identity theft.

30.     Leveraging unique data, science, and patented technology from ID Analytics, Inc. ("ID Analytics"), a wholly-owned subsidiary, LifeLock offers identity theft protection that goes significantly beyond credit monitoring.

31.     On November 1, 2016, the Company issued a press release wherein it reported its financial results for the third quarter ended September 30, 2016.  Total revenue was $170.3 million for the third quarter, up 12% from $152.0 million for the third quarter of 2015.  Consumer revenue was $161.7 million, up 12% from $144.6 million for the third quarter of 2015.  Enterprise revenue was $8.6 million, up 18% from $7.3 million for the third quarter of 2015.  Net income was $14.4 million, compared to net loss of $65.1 million for the third quarter of 2015.  Net income per diluted share was

$0.15 based on 97.3 million weighted-average shares outstanding, compared to net loss per diluted share of $0.68 for the third quarter of 2015 based on 95.3 million weighted-average shares outstanding.  Adjusted net income was $33.5 million, compared to adjusted net income of $27.6 million for the third quarter of 2015.  Adjusted net income per diluted share was $0.34 based on 97.3 million weighted-average shares outstanding, compared to adjusted net income per diluted share of $0.28 for the third quarter of 2015 based on 99.5 million weighted-average shares outstanding.

32. In the November 1 press release, the Company also reported various recent business highlights.  Among other things, LifeLock reported that the Company recorded its forty-sixth consecutive quarter of sequential growth in revenue and cumulative ending members.  LifeLock announced a new partnership agreement with a leading wireless carrier, and ID Analytics announced the launch of the Online Lending Network, a new consortium expected to enhance responsible lending, help protect consumers and businesses, and address credit and fraud risks.  Moreover, the Company added approximately 254,000 gross new members in the third quarter of 2016 and ended the quarter with approximately 4.4 million members.  It also increased monthly average revenue per member to $12.25 for the third quarter of 2016 from $11.91 for the third quarter of 2015.

33. With respect to the strong financial results and business highlights, Individual Defendant Schneider, CEO and President of the Company, commented:

> LifeLock delivered solid financial results in our third quarter with strong annual retention rates, continued adoption of our premium products and strength in our enterprise business. . . . We also reached a number of

important strategic milestones that provide the foundation for continued and meaningful product differentiation including the completion of our flexible and extensible Identity Theft Protection or ITPS platform, the launch of our new LifeLock mobile app and our IDENTITY mobile app that helps consumers simplify the management of their digital identity.

*The Preclusive Merger Agreement*

34.   On November 20, 2016, the Individual Defendants caused LifeLock to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

35.   The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.3(a) of the Merger Agreement states, in relevant part:

> (a) No Solicitation or Negotiation. Subject to the terms of Section 5.3(b), from the date of this Agreement until the earlier to occur of the (1) termination of this Agreement pursuant to Article VIII and (2) Effective Time, the Company will cease and cause to be terminated any discussions or negotiations with, and terminate any data room access (or other access to diligence) of, any Person and its Affiliates, directors, officers, employees, consultants, agents, representatives and advisors (collectively, "Representatives") relating to an Acquisition Transaction. Unless the Company has already so requested prior to the date of this Agreement, promptly following the date of this Agreement, the Company will request that each Person (other than Parent and its Representatives) that has, prior to the date of this Agreement, executed a confidentiality agreement in connection with its consideration of an Acquisition Transaction, promptly return or destroy, in accordance with the terms of such confidentiality agreement, all non-public information furnished to such Person by or on behalf of the Company or its Subsidiaries prior to the date of this Agreement. Subject to the terms of Section 5.3(b) and Section 5.3(d), from

8

the date of this Agreement until the earlier to occur of the (1) termination of this Agreement pursuant to Article VIII and (2) Effective Time, the Company and its Subsidiaries, and their respective directors and executive officers, will not, and the Company will not authorize or direct any of its or its Subsidiaries' employees, consultants or other Representatives to, directly or indirectly, (i) solicit, initiate, propose or induce the making, submission or announcement of, or knowingly encourage, facilitate or assist, any proposal that constitutes, or is reasonably expected to lead to, an Acquisition Proposal; (ii) furnish to any Person (other than Parent, Merger Sub or any of their respective designees) any non-public information relating to the Company or any of its Subsidiaries or afford to any Person access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company or any of its Subsidiaries (other than Parent, Merger Sub or any of their respective designees), in any such case in connection with any Acquisition Proposal or with the intent to induce the making, submission or announcement of, or to knowingly encourage, facilitate or assist, an Acquisition Proposal or the making of any proposal that would reasonably be expected to lead to an Acquisition Proposal; (iii) participate, or engage in discussions or negotiations, with any Person with respect to an Acquisition Proposal or with respect to any inquiries from third Persons relating to the making of an Acquisition Proposal (other than only informing such Persons of the provisions contained in this Section 5.3); (iv) approve, endorse or recommend any proposal that constitutes, or is reasonably expected to lead to, an Acquisition Proposal; (v) enter into any letter of intent, memorandum of understanding, merger agreement, acquisition agreement or other Contract relating to an Acquisition Transaction, other than an Acceptable Confidentiality Agreement (any such letter of intent, memorandum of understanding, merger agreement, acquisition agreement or other Contract relating to an Acquisition Transaction, an "Alternative Acquisition Agreement"); or (vi) authorize or commit to do any of the foregoing.

36.     Further, the Company must advise Symantec, within twenty-four hours, of any proposals or inquiries received from other parties.  Section 5.3(e) of the Merger Agreement states:

(e) Notice to Parent. From the date of this Agreement until the earlier to occur of the (1) termination of this Agreement pursuant to Article VIII and (2) Effective Time, the Company will promptly (and, in any event, by the later of (i) 24 hours from the receipt thereof or (ii) 12:00 noon, Pacific time, on the next Business Day) notify Parent if any Acquisition Proposal, or

9

inquiry from any Person or Group related to making a potential Acquisition Proposal, is, to the Knowledge of the Company (which, for all purposes of this clause (e), will be deemed to also include each member of the Company Board, the Company's financial advisor and legal counsel and will not be deemed to be only as of the date of this Agreement), received by, any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Company or any of its Representatives. Such notice must include (A) the identity of the Person or Group making such proposal, inquiry, request or offer; and (B) a summary of the material terms and conditions of such proposal, inquiry, request or offer and, if writing, a copy thereof together with all material documents provided therewith. Thereafter, the Company must keep Parent reasonably informed, by providing notice by the later of (1) 24 hours from the receipt thereof or (2) 12:00 noon, Pacific time, on the next Business Day after obtaining Knowledge thereof, of any changes in the status and terms of any such offers or proposals (including any amendments thereto) and the status of any such discussions or negotiations.

37.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Symantec a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.3(d) of the Merger Agreement provides, in relevant part:

> (d) Company Board Recommendation Change; Entry into Alternative Acquisition Agreement. Notwithstanding anything to the contrary set forth in this Agreement, at any time prior to the Company obtaining the Requisite Stockholder Approval: . . .
>
> (ii) if the Company has received a written Acquisition Proposal that the Company Board (or a committee thereof) has concluded in good faith (after consultation with its financial advisor and outside legal counsel) is a Superior Proposal, then the Company Board may (A) effect a Company Board Recommendation Change with respect to such Superior Proposal; or (B) authorize the Company to terminate this Agreement pursuant to Section 8.1(h) to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal, in each case if and only if:
>
> (1) the Company Board (or a committee thereof) determines in good faith

(after consultation with its financial advisor and outside legal counsel) that the failure to do so would be reasonably expected to be inconsistent with its fiduciary duties pursuant to applicable Law;

(2) the Company has complied in all material respects with its obligations pursuant to this Section 5.3 with respect to such Acquisition Proposal; and

(3)(i) the Company has provided prior written notice to Parent at least five Business Days in advance (the "Notice Period") to the effect that the Company Board (or a committee thereof) has (A) received a written Acquisition Proposal that has not been withdrawn; (B) concluded in good faith (after consultation with its financial advisor and outside legal counsel) that such Acquisition Proposal constitutes a Superior Proposal; and (C) resolved to effect a Company Board Recommendation Change or to terminate this Agreement pursuant to this Section 5.3(d)(ii), which notice will describe the basis for such Company Board Recommendation Change or termination, including the identity of the Person or Group making such Acquisition Proposal, the material terms of such Acquisition Proposal and copies of all relevant documents relating to such Acquisition Proposal; and (ii) prior to effecting such Company Board Recommendation Change or termination, the Company and its Representatives, during the Notice Period, have (1) negotiated with Parent and its Representatives in good faith (to the extent that Parent desires to so negotiate) to make such adjustments to the terms and conditions of this Agreement so that such Acquisition Proposal would cease to constitute a Superior Proposal; and (2) permitted Parent and its Representatives to make a presentation to the Company Board regarding this Agreement and any adjustments with respect thereto (to the extent that Parent requests to make such a presentation), it being understood that (a) in the event of any material revisions to such Acquisition Proposal, the Company will be required to deliver a new written notice to Parent and to comply with the requirements of this Section 5.3(d)(ii)(3) with respect to such new written notice (with the "Notice Period" in respect of such new written notice being three Business Days); and (b) at the end of the Notice Period, the Company Board (or a committee thereof) must have in good faith (after consultation with its financial advisor and outside legal counsel) reaffirmed its determination that such Acquisition Proposal is a Superior Proposal.

38.     Further locking up control of the Company in favor of Symantec, the Merger Agreement provides for a "termination fee" of $87.5 million, payable by the

11

Company to Symantec if the Individual Defendants cause the Company to terminate the Merger Agreement.

39. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

40. Additionally, Symantec has entered into a support agreement with Individual Defendants Schneider, Davis, and Cowan, as well as Bessemer Venture Partners, which currently owns approximately 5,540,485 shares of LifeLock common stock, pursuant to which such parties have agreed to vote their Company shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

*Inadequate Merger Consideration and Interests of the Company's Officers and Directors*

41. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

42. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

43. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

44. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

45. For example, Individual Defendants Davis, Schneider, and Cowan stand to receive $47,447,061, $34,314,336, and $14,914,848, respectively, in connection with the Proposed Transaction.

46. Moreover, LifeLock's executive officers (other than Davis and Schneider) stand to receive $27,750,301, and the Company's non-employee directors (other than Cowan) stand to receive $9,817,013.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

47. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction. As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

48. The Proxy Statement omits material information regarding LifeLock's projected financial information and the financial analyses performed by the Company's financial advisor, Goldman, Sachs & Co. ("Goldman"), in support of its so-called fairness opinion.

49. For example, with respect to Goldman's *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) LifeLock's estimated number of fully diluted shares outstanding as of the end of each year as part of the Five-Year Forecasts as used in this analysis; (ii) the projected levels of total debt, total cash, and cash equivalents as of the end of each year as part of the Five-Year Forecasts, which would have been required to convert the resulting Enterprise Values from the use of the selected EV/EBITDA multiples to Equity Values, to then be

13

discounted at the selected cost of equity; and (iii) Goldman's basis for selecting and applying a Forward Free Cash Flow Yield range of 6.6% to 9.9% and an EV/EBITDA multiple range of 9.0x to 13.6x.

50. With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying the weighted average cost of capital analysis; (ii) Goldman's basis for applying perpetuity growth rates ranging from 2.50% to 3.50%; and (iii) the amount by which LifeLock's indebtedness exceeded its cash as of September 30, 2016.

51. The Proxy Statement also fails to disclose the inputs, assumptions, and methodologies used by LifeLock to determine the net present value of standalone net operating losses is $77 million.

52. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

53. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Fairness Opinion of Goldman, Sachs & Co."; (ii) "Financial Forecasts"; (iii) "Recommendation of the LifeLock Board and Reasons for the Merger"; and (iv)

"Background of the Merger."

54. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to LifeLock's stockholders.

**COUNT I**

*Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and LifeLock*

55. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

56. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. LifeLock is liable as the issuer of these statements.

57. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

58. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

59. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a

full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

60. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

61. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

62. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

### COUNT II

*Claim for Violation of Section 20(a) of the 1934 Act*
*Against the Individual Defendants and Symantec*

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64. The Individual Defendants and Symantec acted as controlling persons of LifeLock within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of LifeLock and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

65. Each of the Individual Defendants and Symantec was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

66. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

67. Symantec also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

68. By virtue of the foregoing, the Individual Defendants and Symantec violated Section 20(a) of the 1934 Act.

69. As set forth above, the Individual Defendants and Symantec had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

| | | |
|---|---|---|
| 1 | Dated:  December 16, 2016 | s/Gerald Barrett |
| 2 | | Gerald Barrett, SBN 5855 |
| | **OF COUNSEL:** | WARD, KEENAN & BARRETT, P.C. |

Dated:  December 16, 2016

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, Delaware  19803
Telephone:  (302) 295-5306
Facsimile:  (302) 654-7530
BDL@rl-legal.com
GMS@rl-legal.com

s/Gerald Barrett
Gerald Barrett, SBN 5855
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, Arizona  85012
Telephone:  (602) 279-1717
Facsimile:  (602) 279-8908 (fax)
gbarrett@wardkeenanbarrett.com

*Attorneys for Plaintiffs*

19